IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CASCADE FOREST CONSERVANCY,                    No. 3:19-cv-00424-HZ

               Plaintiff,                    OPINION & ORDER

     v.

LENORE HEPPLER; BUREAU OF
LAND MANAGEMENT – OREGON;
GAR ABBAS; and UNITED STATES
FOREST SERVICE,

             Defendants,

ASCOT USA INC. and ASCOT
RESOURCES LTD,

            Intervenor-Defendants.


Roger Flynn
WESTERN MINING ACTION PROJECT
P.O. Box. 349
Lyons, CO 80540


1 – OPINION & ORDER

Thomas Charles Buchele
EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, OR 97219

      Attorneys for Plaintiff

Michael Sawyer
U.S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
4 Constitution Square, 150 M St. NE
Washington, DC 20002

      Attorney for Defendants

Kirk B. Maag
Crystal Chase
STOEL RIVES LLP
760 S.W. Ninth Ave., Suite 3000
Portland, OR 97205

      Attorneys for Intervenor-Defendants

HERNÁNDEZ, District Judge:

      Plaintiff Cascade Forest Conservancy brings this action against Defendants Lenore Heppler, the United States Bureau of Land Management, Gar Abbas, and the United States Forest Service (the "Federal Defendants"), alleging violations of the Administrative Procedure Act ("APA"), the Land and Water Conservation Fund Act ("LWCFA"), the Reorganization Plan No. 3 of 1946, and the National Environmental Policy Act ("NEPA"). Compl., ECF 1. Specifically, Plaintiff challenges Defendant USFS's January 29, 2018 Decision Notice ("DN") and Finding of No Significant Impact ("FONSI"), Defendant BLM's December 3, 2018 Decision Record ("DR") and FONSI, and the underlying August 2017 Modified Environmental Assessment ("2017 EA") for the Goat Mountain Hardrock Mineral Prospecting Permits. *Id.* On June 3, 2019, Judge Acosta granted a Motion to Intervene filed by Intervenor-Defendants Ascot USA Inc. and Ascot Resources Ltd. ("Defendant Ascot"). Plaintiff, the Federal Defendants, and

Defendant Ascot now move for summary judgment on all of Plaintiff's claims. Def. Ascot Mot. Summ. J. ("Def. Ascot Mot."), ECF 45; Pl. Mot. Summ. J. ("Pl. Mot."), ECF 46; Fed. Def. Mot. Summ. J. ("Fed. Def. Mot."), ECF 52. On September 18 and 30, 2020, the Court held oral argument on the parties' motions. For the reasons that follow, the Court grants in part and denies in part the parties' cross motions for summary judgment.

## BACKGROUND

This case concerns two applications for hardrock mineral prospecting permits in the Gifford Pinchot National Forest near Goat Mountain, adjacent to the Mount St. Helens National Volcanic Monument boundary. NAR 149, 335.[1] This is an area that has seen human activity for over 100 years, with dominant land uses including logging, silvicultural activity, recreation, mineral prospecting, and limited mineral development. NAR 152. Presently, the area is used primarily for recreation, with peak use from July through late October. NAR 188. The Project Area includes the Green River Horse Camp as well as access to a few hiking trails. NAR 188.

The Permit Area encompasses three parcels: MS-1329, MS-1330, and MS-708. Based on available information, the parcels include part of a potentially valuable mineral deposit known as the Margaret Deposit. NAR 153. But there have been only limited mineral exploration programs conducted in the area. In the middle of the twentieth century, Duval Corporation owned the plots at issue and conducted limited drilling and mineral prospecting. NAR 152–53. Fieldwork halted after the eruption of Mount St. Helens in 1980, "before an understanding of the Margaret Deposit

---

[1] The Administrative Record ("AR"), the Supplemental Administrative Record ("SAR"), and New Administrative Record ("NAR") consists of four DVDs, which were filed with the Court on August 5, 2019. ECF 36. The AR contains pages AR 00001 through AR 26843, and the SAR contains pages SAR 0001 through SAR 2842. These were compiled for the 2013 case *Gifford Pinchot Task Force v. Perez*, No. 3:13-cv-00810-HZ. The NAR contains pages NAR 00001 through NAR 66183.

sufficient for current economic resource evaluation was developed." NAR 153. In the mid-1980s, Duval divested its hardrock mineral holdings. NAR 153. Defendant USFS acquired the lands by donation and purchase in 1986. NAR 153. The Government owns 100% of both the surface estate and mineral interest of MS-1329 and MS-1330, which were purchased with funds from the LWCFA. NAR 153–54, 162. The Government also own 100% of the surface estate of parcel MS-708, but it only acquired 50% of the mineral rights in MS-708. NAR 153–54. The other half was acquired by Defendant Ascot in 2010. NAR 154. The surface estates of the parcels are managed by Defendant USFS, and the mineral estates are managed by Defendant BLM. NAR 151.

In 2010 and 2011, Defendant Ascot submitted proposals to the Federal Defendants to drill exploration holes to assess the mineral estate. With Defendant USFS's concurrence, Defendant Ascot completed 11 exploration holes on MS-708 in 2010. NAR 154. In 2011, Defendant Ascot submitted two Prospecting Permit Applications to drill sixty-three holes at twenty-three pad sites on MS-1329, MS-1330, and MS-708. NAR 149, 151, 154–55. According to the Federal Defendants, core samples from these drillholes would provide geological and mineralogical information needed to fill in the gaps in the historical data previously gathered by Duval Corporation. NAR 177. The information would also verify historical information and complete the geological model of the site. NAR 177.

In 2012, Defendants USFS and BLM jointly prepared an environmental assessment ("2012 EA") of the Proposed Action, which served as the basis of the Defendant USFS's 2012 Decision Notice and Finding of No Significant Impact and Defendant BLM's Decision Record and Finding of No Significant Impact. NAR 149, 155. Plaintiff—formerly known as Gifford Pinchot Task Force—then filed a complaint in this Court alleging that the Federal Defendants

had violated NEPA and the LWCFA in issuing the 2012 EA and related documents. The Court

agreed in part, vacating the Federal Defendants' decisions in August 2014. NAR 149. The Court

concluded that the 2012 EA violated NEPA and the LWCFA because, in relevant part, it failed

to: (1) recognize outdoor recreation as a primary purpose for several of the land parcels; (2)

analyze baseline conditions and impacts on groundwater; and (3) consider all reasonable

alternatives. *See Gifford Pinchot Task Force v. Perez*, No. 03:13-cv-00810-HZ, 2014 WL

3019165 (D. Or. July 3, 2014).

　　After this Court's ruling, Defendant Ascot requested that the Federal Defendants modify

the 2012 EA and prepare new decisions. NAR 55831. In December 2015, the Federal Defendants

prepared a modified environmental assessment ("2015 EA") and released it for public comment

in January 2016. NAR 498–851. Plaintiff submitted an extensive comment, asserting the 2015

EA did not address the inadequacies found by this Court in its 2014 Opinion & Order. NAR

37502–52. Plaintiff also submitted a FOIA request to both Agencies before submitting its

comment, but neither agency responded before the end of the comment period. NAR 39732–34,

24995–96; Compl. ¶ 61.

　　The environmental assessment was further modified in 2017. NAR 131–491. In the final

2017 EA, the Federal Defendants considered four alternatives. NAR 171. Alternative 1 is the no

action alternative. NAR 171. Alternative 2 closely follows the Proposed Action as described in

Defendant Ascot's Prospecting Permit Applications and Exploration Plan. NAR 171. It also

includes some specific conditions put forth by the Federal Defendants to protect the land and the

primary purposes for which it was acquired. NAR 171. Alternative 3 was created based on

scoping comments and largely follows Alternative 2 with the addition of (1) measures to protect

water in the Project Area, (2) timing restrictions to protect the habitat of the Northern Spotted

Owl and recreation, and (3) additional drill shack features to reduce noise and light pollution.

NAR 177. Alternative 4 is the same as Alternative 3 but excludes drilling activities at Pads 6 and

7 located in the riparian reserve along the Green River. NAR 177.

The 2017 EA also considered but eliminated a few alternatives, including limiting

prospecting activities to only MS-708, the parcel in which Defendant Ascot and the Government

each own a 50% interest in the mineral estate. NAR 186–87. This alternative would eliminate ten

of the proposed drill sites and require redirection of drilling from two other sites. NAR 186. The

Federal Defendants eliminated this alternative because it would not meet the needs of the

applicant or the Government. NAR 186–87. Specifically, it would not provide Defendants with

the scientific knowledge gained from the full extent of the proposed prospecting or sufficient

information to know whether a valuable deposit exists in the Project Area for the purposes of any

future action regarding a mineral lease. NAR 187.

After this Court's 2014 decision, the Federal Defendants conducted a groundwater

resources investigation, which was appended to the 2017 EA as Appendix G. NAR 149. The

2017 EA also includes a discussion regarding the primary purpose of MS-1329 and MS-1330

under the LWCFA. NAR 149.

Based on the 2017 EA, Defendant USFS issued a draft DN and FONSI for public

objection. NAR 105–28. Plaintiff objected to the draft DN and FONSI, arguing that the Federal

Defendants had failed to respond to its FOIA requests and the 2017 EA was still deficient for

failing to comply with the 2014 Opinion & Order. NAR 8645–89. Defendant USFS consented to

the prospecting application in its final 2018 DN and FONSI selecting Alternative 4. NAR 70–

103. Defendant BLM subsequently issued its 2018 DR and FONSI granting Defendant Ascot's

applications. NAR 1–67. On March 22, 2019, Plaintiff filed this action challenging the Federal

Defendants' actions. Compl.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). However,

"[t]he legal standards for resolving a motion for summary judgment are inconsistent with the

standards for judicial review of agency action[.]" *Klamath Siskiyou Wildlands Ctr. v. Gerritsma*,

962 F. Supp. 2d 1230, 1233 (D. Or. 2013), *aff'd*, 638 F. App'x 648 (9th Cir. 2016) (citation

omitted). Nonetheless, where, as here, there are no material factual disputes and the

administrative record before the court is complete, summary judgment serves as the appropriate

vehicle for the court to conduct its review of the agency action. *Occidental Eng'g Co. v. I.N.S.*,

753 F.2d 766, 770 (9th Cir. 1985); *Defs. of Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1215 (D.

Mont. 2010) ("Summary judgment is a particularly appropriate tool for resolving claims

challenging agency action.").

The claims in this case are governed by the APA, which requires a court to "compel

agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), and to "hold

unlawful and set aside agency action, findings and conclusions found to be . . . arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C.

§ 706(2)(A); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir.

2014) (applying the APA to claims under NEPA). Agency action is arbitrary and capricious

where: "the agency fails to consider an important aspect of a problem, . . . the agency offers an

explanation for the decision that is contrary to the evidence, . . . the agency's decision is so

implausible that it could not be ascribed to a difference in view or be the product of agency

expertise, or . . . the agency's decision is contrary to the governing law." *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) and 5 U.S.C. § 706(2)).

The arbitrary and capricious standard is "searching and careful, but the ultimate standard of review is a narrow one." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)) (internal quotation marks omitted). The court asks whether the agency's action "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* The agency's decision is "entitled to a presumption of regularity," and a reviewing court "may not substitute [its] judgment for that of the agency." *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 601 (citation omitted). Although deference is owed to an agency, a reviewing court "must not 'rubber-stamp . . . administrative decisions that [it] deem[s] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.'" *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1236 (9th Cir. 2001) (quoting *N.L.R.B. v. Brown*, 380 U.S. 278, 291 (1965)) (first alteration in original).

## DISCUSSION

Plaintiff brings two claims for relief. Plaintiff's first claim alleges that the Federal Defendants failed to comply with the LWCFA and the Reorganization Plan No. 3 of 1946. Plaintiff's second claim alleges six counts of violations of NEPA. The parties move for summary judgment on both of Plaintiff's claims. The Court addresses each below.

## I.    Claim 1: Reorganization Plan No. 3 & LWCFA

Plaintiff first alleges that the Federal Defendants' decision documents violate the LWCFA because: (1) "the Project will degrade or destroy recreation opportunities and scenic

values in the area, and otherwise interfere with the purpose(s) for which the Project lands were acquired"; and (2) "the DN/FONSI improperly elevates the general policy goals of the Mining and Mineral Policy Act as a controlling purpose either equal to or above recreation." Compl. ¶¶ 67–72.

Neither party disputes that the parcels at issue here—MS-1329 and MS-1330—were purchased pursuant to the authority of the Weeks Act and with money appropriated under the LWCFA. *See Gifford Pinchot Task Force*, 2014 WL 3019165, at *8–9. As this Court previously held, the Reorganization Plan No. 3 of 1946 and the Weeks Act, taken together, authorize the Secretary of the Interior to permit mineral development on the parcels at issue "provided, however, that the Secretary of Agriculture advises that mineral development activities do not interfere with the primary purposes for which the lands were acquired." *Id.* at *8 (citing 5 U.S.C. App. 1 (Reorganization Plan No. 3 of 1946, § 402) and 16 U.S.C. § 520). Because the parcels were acquired using funds appropriated under the LWCFA, the land is "primarily of value for outdoor recreation purposes."[2] *Id.* at *9 (citing 16 U.S.C. § 460*l*-9(a)(1)(b)). The "'primary purposes for which the lands were acquired' controls not just the initial acquisition of the lands, but the manner of their development postacquisition." *Id.* at *10. Thus, in considering the mineral development of the land, "outdoor recreation must be considered by the USFS[.]" *Id.* at *11.

In its previous decision regarding the 2012 EA, the Court found that the 2012 EA and USFS DN/FONSI were legally inadequate because they did not expressly recognize outdoor recreation as a primary purpose for which the land was acquired. *Id.* at *15. Though the 2012 EA

---

[2] Because the Project lands were purchased under the authority of the Weeks Act, they are also to be used to protect the flow of navigable streams and for the production of timber. 16 U.S.C. § 515; *see also Gifford Pinchot Task Force*, 2014 WL 3019165, at *8–9, *16.

made findings of some negligible impact on outdoor recreation, the Court explained that

Defendants' findings were still legally inadequate:

> [A] finding that the environmental impact is negligible is not equal to a finding that
> the Project is not inconsistent with the primary purpose of outdoor recreation. . . .
> [T]he LWCF Act does not require that the land be used exclusively for outdoor
> recreation, and while the requisite finding could possibly be inferred from the 2012
> EA, the law requires an express determination by the Secretary of Agriculture.
> Because that is lacking here, the [USFS]'s consent is arbitrary and capricious in
> regard to the LWCF Act purpose of outdoor recreation.

*Id.*

Now, Plaintiff again challenges the 2017 EA's findings regarding the Project's potential

interference with recreation, arguing that Defendant USFS's determination that prospecting will

not interfere with recreation relies on an "unlawful exception" for temporary interference and is

arbitrary and capricious. Pl. Mot. 7–12. In addition, Plaintiff argues that Defendant USFS erred

by not considering recreation as the primary purpose for which the land was acquired and instead

elevating "mineral development as a co-equal or superior purpose on land acquired for

recreation." *Id.* at 12–15.

A.      Interference with Outdoor Recreation

Plaintiff first alleges that Defendant USFS's consent to mineral prospecting in this case

was erroneous because it will interfere with recreation, one of the primary purposes of the

parcels at issue here. Pl. Mot. 9. Given the proximity of the prospecting to an established

campground, trails, and other dispersed recreation opportunities, Plaintiff argues that the noise

and other activities resulting from the proposed mineral prospecting will interfere with public

access to outdoor recreation on these parcels. *Id.* at 9–10. Plaintiff contends that Defendant

USFS ignores the plain meaning of the statutory standard and, instead, relies on an unlawful

exception for "temporary interference." *Id.* at 11–12. In addition, Plaintiff asserts "the USFS

never actually ma[de] the required 'will not interfere' determination," instead finding that the proposed project was "not inconsistent with" the parcels' primary purpose. *Id.* at 8.

As stated in this Court's earlier decision, "'[l]ands purchased by the USFS with LWCF Act funds must be 'primarily of value for outdoor recreation purposes.'" *Gifford Pinchot Task Force*, 2014 WL 3019165, at *9 (quoting 16 U.S.C. § 460*l*-9(a)(1)(b)). The purpose of the LWCFA was:

> [T]o assist in preserving, developing, and assuring accessibility to all citizens of the United States of America of present and future generations and visitors who are lawfully present within the boundaries of the United States of America such quality and quantity of outdoor recreation resources as may be available and are necessary and desirable for individual active participation in such recreation and to strengthen the health and vitality of the citizens of the United States[.]

16 U.S.C. § 460*l*-4. USFS documents regarding the acquisition of these particular parcels indicated that the purchase of these lands would "aid in the preservation of the integrity of the Green River . . . [and] the scenic beauty of [the] area." *Gifford Pinchot Task Force*, 2014 WL 3019165, at *9 (quoting AR 25672, 23033).

As a preliminary matter, the Court finds that the Defendant USFS did not fail to make the required finding that the proposed project would not interfere with outdoor recreation. Though, as Plaintiff notes, the USFS DN uses the words "inconsistent with" in its analysis, NAR 90 (USFS DN finding that "the action is not inconsistent with the purpose of outdoor recreation"), the 2017 EA—upon which the USFS DN is based—expressly finds that the Proposed Action will not interfere with recreation, NAR 71, 309 (2017 EA finding that "[f]or the above reasons the Project is not expected to disturb the recreation experience to the extent that it would interfere with recreation as a primary purpose for the lands acquired through LWCF").

The Court also finds that Defendant USFS has not ignored the plain meaning of the statutory text and applied an unlawful "temporary" exception to the statutory standard. First, the

Court is not persuaded that "interfere" as used in the Reorganization Act and as applied to the LWCFA means any hindrance, delay, or obstruction to the public's access to outdoor recreation as Plaintiff suggests. Pl. Mot. 10 (citing Am. Heritage Dictionary (5th Ed. 2011)). Interfere, as defined by the Webster's dictionary that was in existence at the time the Reorganization Act was enacted, means: "2. To come in collision; to clash; also, to be in opposition; to run at cross-purposes; as *interfering* claims." *Interfere*, Webster's New Int'l Dict. (2d ed. 1934); *see New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) ("It's a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary . . . meaning . . . at the time Congress enacted the statute." (internal quotations and citation omitted)). This definition, particularly when taken in the context of the statute, indicates that "interfere with" means something more than *any* hindrance, delay, or obstruction. *See U.S. v. Mohrbacher*, 182 F.3d 1041, 1049 (9th Cir. 1999) ("In determining the meaning of a statutory provision, a court may consider the purpose of the statute in its entirety, and whether the proposed interpretation would frustrate or advance that purpose." (internal citations and quotations omitted)); *U.S. v. TRW Rifle 7.62X51mm Caliber, One Model 14 Serial 593006*, 447 F.3d 686, 690 (9th Cir. 2006) ("[W]e do not ascertain ordinary meaning in the abstract . . . . [W]ords rarely have an objective meaning divorced from the context of their usage."). The drafters of the statutory scheme at issue specifically envisioned the use of the land for multiple purposes. The statutes allow mineral development on land acquired pursuant to the Weeks Act in order to protect the flow of navigable streams and for the production of timber.[3] *See* 16 U.S.C. § 520; 5 U.S.C. App. 1

---

[3] Indeed, this Court acknowledged as much in its last decision that the Project was not inconsistent with the Weeks Act purposes for which it was acquired. *Gifford Pinchot*, 2014 WL 3019165, at *14–15. The Court concluded that the project would not interfere with timber production because few mature trees would be removed and the Project involves a small number of acres. *Id*. The Court also concluded that the Project does not interfere with navigable stream

(Reorganization Plan No. 3 of 1946, § 402). It is difficult to envision any mineral development or prospecting that would not—under Plaintiff's definition—interfere with recreation to some degree, thus rendering these statutes meaningless for any lands acquired pursuant to the Weeks Act with LWCFA funds. *In re Cervantes*, 219 F.3d 955, 961 (9th Cir. 2000) (court must reject "interpretations that would render a statutory provision surplusage or a nullity").

Second, even applying its suggested narrower definition, Plaintiff's argument still fails. Key to this analysis is the statutory purpose of LWCFA:

> [T]o assist in preserving, developing, and assuring accessibility to . . . such quality and quantity of outdoor recreation resources as may be available and are necessary and desirable for individual active participation in such recreation and to strengthen the health and vitality of the citizens of the United States.

16 U.S.C. § 460*l*-4. In light of this language, Defendant USFS's emphasis on the temporary and limited nature of the project makes sense. Because of the temporary and limited nature of the project, it will not hinder the over-arching purpose of lands procured under LWCFA, that is as land for outdoor recreation resources of such a quantity and quality necessary and desirable for individual active participation in such recreation and to strengthen the health and vitality of the citizens of the United States. To be clear, in finding that the Federal Defendants' findings do not violate the Reorganization Act and LWCFA in this case, the Court is not concluding that any temporary project—no matter how significant the effects—does not constitute "interference" under the statutory scheme. Rather, this Court's holding is limited to the very specific facts of this case, as detailed below.

---

flow, noting specifically that the Project was temporary. *Id.* Were the Court to apply Plaintiff's proposed definition, the removal of any trees for mineral development, for example, would have interfered with timber production as a hinderance or obstacle to that production.

Defendant USFS's finding that the Proposed Action will not interfere with the recreational purpose of the land is not arbitrary and capricious. The 2017 EA devotes eight pages to its discussion of the Proposed Action's impact on recreation. NAR 301–09. The 2017 EA acknowledges that the Project Area provides a variety of recreational opportunities for the public, including the Green River Horse Camp and hiking trails. NAR 188, 301–02. Due to weather-related accessibility issues, the recreation season extends primarily from July through October and overlaps with the Proposed Action's timeline. NAR 173, 302. According to the 2017 EA, all recreation opportunities would remain available to the public throughout the recreation season: The Horse Camp and hiking trails would remain open during the Proposed Action, and the public would still have opportunities for dispersed recreation in semi-primitive or undeveloped settings. NAR 303–04.

The 2017 EA acknowledges that there would be some direct effects on recreation but reasonably finds that the effects of the proposed prospecting would be transient or negligible and therefore not interfere with the recreational purpose for which the lands were acquired.[4] For example, there would be noise disturbance from drilling activities when the drill pads are operational twenty-four hours a day, seven days a week. But these effects would be limited because only one drill pad would be operational at a time, and a portable drill shack—with additional baffles and insulation—would muffle noise and reduce light impacts from the drilling. NAR 304. None of the drill pads are within ¼ mile of the Green River Horse Camp under the chosen alternative, and all the drill pads are approximately ½ mile or more from the adjacent

---

[4] In the briefing and at oral argument, the parties emphasized the Eighth Circuit case *Sierra Club v. Davies*, 955 F.2d 1188 (8th Cir. 1992). However, *Sierra Club* involves a different provision of the LWCFA, which prohibits the conversion of certain lands to "other than public outdoor recreation uses." *Id.* at 1191 (citing 16 U.S.C. § 460*l*-8(f)(3)).

Tumwater Roadless Area. NAR 304–08. Therefore, while noise could reduce the opportunity for solitude within the immediate vicinity of each drill pad, these drill pads would otherwise not be seen or heard by recreationists, including those seeking semi-primitive or undeveloped recreation in the Tumwater Roadless Area area except when passing through the Project Area. NAR 304–08. The 2017 EA also reasonably finds that the additional traffic from workers would not interfere with recreation in the area and that hunting and wildlife viewing opportunities would continue to occur in other areas around the Project Area. NAR 305. The nature and duration of any impacts on recreation would cease upon completion of the Proposed Action and be "of a nature that would not permanently impair recreation in the Project Area." NAR 305–06. The Proposed Action is designed to remove all equipment at the end of the Project and reclaim disturbed areas. NAR 308. Finally, the 2017 EA reasonably focuses on a five-month period in analyzing the Proposed Actions potential effects on recreation because the timetable of operations for the Project is a five-month period between May and November. NAR 173, 1429.

In summary, Defendant USFS complied with the LWCFA in making its determination that the Proposed Action is not inconsistent with the primary purpose for which the land was acquired under the LWCFA based on the 2017 EA's determination that the Proposed Action would not interfere with recreation. Defendant USFS did not err in focusing on the temporary and limited nature of the Proposed Action and its effects on recreation. Applying the deferential standard of review owed to the agencies under the APA, the 2017 EA supports Defendant USFS's non-interference determination. Thus, the Federal Defendants' finding that the Project does not interfere with the LWFCA purpose for which the land was acquired was not arbitrary, capricious, or contrary to law.

///

B.      Failure to Consider Recreation as Primary Purpose

Plaintiff also argues that Defendant USFS erred by not considering recreation as the "primary" purpose for which the land was acquired and, instead, elevating mineral development as a co-equal or superior purpose. Pl. Mot. 13. In failing to consider recreation as the parcels' primary purpose, Plaintiff argues, Defendant USFS's consent decision violates the LWCFA and Reorganization Act No. 3 of 1946 and is therefore contrary to law. *Id.* The Federal Defendants respond by noting that: (1) the land was purchased for multiple primary purposes, not just the sole purpose of outdoor recreation; and (2) Defendant USFS did recognize recreation as the primary purpose of the land acquisition. Fed. Def. Resp. 14–15, ECF 68; *see also* Def. Ascot's Resp. 2–8, ECF 65.

The Court is not persuaded that the separate consideration of mineral development in the consent decision renders Defendant USFS's analysis improper under the APA.[5] *See* NAR 75–76 (finding "[t]his decision is consistent with the Federal government's overall policy to foster and encourage private enterprise in the development of economically sound and stable mining and mineral industries, and to help assure the orderly and economic development of mineral resources to satisfy industrial, security and environmental needs"). First, as Defendant USFS and this Court have recognized, the parcels at issue have multiple primary purposes, and "the LWCF Act does not require that the land be used exclusively for outdoor recreation." *See Gifford Pinchot Task Force*, 2014 WL 3019165 at *15; NAR 89–90. Indeed, this Court previously found

---

[5] Plaintiff made a similar argument with regard to the 2012 EA's analysis of timber production and the protection of navigable streams in *Gifford Pinchot Task Force*, 2014 WL 3019165, at *12–13. The Court rejected this argument, finding: "The fact that the 2012 EA mentions various statutes that permit mining activity on USFS land does not diminish the importance of protecting navigable stream flows or timber production as the primary purposes for the land's acquisition, nor does it elevate mining to a primary purpose for the purchase of the land." *Id.*

that these purposes include timber production, protection of navigable stream flow, and outdoor recreation under both the Weeks Act and the LWCFA. *Gifford Pinchot Task Force*, 2014 WL 3019165, at *16. Second, the Reorganization Plan No. 3 of 1946 and the Weeks Act, taken together, specifically empower the Secretary of the Interior to authorize mineral development on these parcels, so long as the Secretary of Agriculture advises that said "development will not interfere with the primary purposes for which the land was acquired."[6] *See* 5 U.S.C. App. 1 (Reorganization Plan No. 3 of 1946, § 402); 16 U.S.C. § 520. Thus, consideration of mineral development is expressly authorized by the statutory scheme governing the Project lands at issue, and the consideration of mineral development in Defendant USFS's consent decision is not contrary to law.

The Court also agrees with Defendants that the consent decision elevates recreation as one of multiple primary purposes of parcels MS-1329 and MS-1330. In its consent decision, Defendant USFS determined that—for land acquired with funds from the LWCFA—the prospecting permits were "not inconsistent with the primary purpose of outdoor recreation." NAR 74, 90. The consent decision also explains that Defendant USFS chose Alternative 4 because it "reduced impacts on recreation." NAR 75. Specifically, Alternative 4 eliminates Pads 6 and 7, thus eliminating "direct effects on visual or scenic resources associated with campsites in the vicinity of the Green River Horse Camp . . . [and] the recreational experience associated with the use of the horse camp." NAR 75, 90. Accordingly, in rendering its consent decision, Defendant USFS properly considered recreation as one of the primary purposes for which the Project lands at issue here were acquired.

---

[6] Prior to the passage of the Reorganization Plan No. 3 of 1946, the power to authorize mineral development on Weeks Act lands was vested in the Secretary of Agriculture. *See* 16 U.S.C. § 520.

## II.    Claim 2: NEPA

In its second claim, Plaintiff alleges that the Federal Defendant violated NEPA. NEPA has two principal aims. *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council,* 462 U.S. 87, 97 (1983).  First, NEPA requires government agencies to "consider every significant aspect of the environmental impact of a proposed action." *Id.* (internal quotation marks omitted). Second, NEPA guarantees that relevant information is available to the public. *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085 (9th Cir. 2011); *see also Citizens Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1021 (10th Cir. 2002) ("NEPA mandates that government agencies inform the public of the potential environmental impacts of proposed actions and explain how their decisions address those impacts.").

"NEPA is a procedural statute that does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions."  *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639–40 (9th Cir. 2004) (internal quotation marks omitted).  To comply with NEPA, federal agencies must prepare an Environmental Impact Statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332(2)(C).

"As a preliminary step, the agency may prepare an Environmental Assessment ('EA') to determine whether the environmental impact of the proposed action is significant enough to warrant an EIS." *High Sierra Hikers Ass'n*, 390 F.3d at 639–40.  An EA is "a concise public document" that should: "(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact[;] (2) Aid an agency's compliance with [NEPA] when no environmental impact statement is

necessary[;] (3) Facilitate preparation of [an EIS] when one is necessary." 40 C.F.R. § 1508.9(a)(1)–(3).[7]

"An EA must include brief discussions of the need for the [federal action], of reasonable alternatives, and of the anticipated environmental impacts." *Hapner v. Tidwell*, 621 F.3d 1239, 1244 (9th Cir. 2010); *see also* 40 C.F.R. § 1508.9(b). An agency must then prepare an EIS "if substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor." *Cal. Trout v. FERC*, 572 F.3d 1003, 1016 (9th Cir. 2009) (internal quotation marks omitted); *see also Jones v. Nat'l Marine Fisheries Serv.*, 741 F.3d 989, 997 (9th Cir. 2013) (EIS is required when the "effects on the human environment are 'highly uncertain or require unique or unknown risks[.]'") (quoting 40 C.F.R. § 1508.27(b)(5)). An EA need not meet all the requirements of an EIS, but "it must be sufficient to establish the reasonableness of the decision not to prepare an EIS." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1215 (9th Cir. 2008) (internal quotation marks and brackets omitted).

In this case, Plaintiff alleges six separate NEPA violations: (1) failure to evaluate all reasonable alternatives; (2) failure to adequately consider all cumulative impacts of the proposed prospecting; (3) failure to take a "hard look" at the impact of prospecting on recreation; (4) failure to include a comprehensive groundwater baseline analysis; (5) failure to prepare an EIS; and (6) violation of NEPA's public participation requirement. At this time, the Court defers

---

[7] "The Council on Environmental Quality has adopted new regulations that became effective on September 14, 2020." *Bair v. California Dep't of Transp.*, 982 F.3d 569, 577 n.20 (9th Cir. 2020) (citing Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304, 43,304 (July 16, 2020) and 40 C.F.R. § 1506.13 (2020)). Because the Federal Defendants applied the previous regulations to the Project, the Court does so as well.

consideration of Plaintiff's claim that the Federal Defendants violated NEPA in failing to prepare

an EIS and will seek further briefing on this issue along with remedies in light of this Opinion &

Order. The Court addresses the rest of the alleged violations in turn.

A.    Count 1: Reasonable Alternatives

Plaintiff argues that the Federal Defendants failed to evaluate all reasonable alternatives

in their 2017 EA as required by NEPA. Pl. Mot. 24. Specifically, Plaintiff points to the

reasonable alternative of limiting Defendant Ascot's prospecting to MS-708. *Id.* Congress

created NEPA "to protect the environment by requiring that federal agencies carefully weigh

environmental considerations and consider potential alternatives to the proposed action before

the government launches any major federal action." *Barnes v. U.S. Dep't of Transp.,* 655 F.3d

1124, 1131 (9th Cir. 2011) (internal quotation marks omitted). "NEPA's requirement that

agencies 'study, develop, and describe appropriate alternatives . . . applies whether an agency is

preparing an [EIS] or an [EA].'" *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir.

2013) (quoting *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153

(9th Cir. 2008)). "Although an agency must still give full and meaningful consideration to all

reasonable alternatives in an environmental assessment, the agency's obligation to discuss

alternatives is less than in an EIS." *Id.* (citations omitted). "The existence of a viable but

unexamined alternative renders an environmental impact statement inadequate." *Te-Moak Tribe*

*of W. Shoshone of Nevada v. U.S. Dep't of Interior,* 608 F.3d 592, 602 (9th Cir. 2010) (quoting

*Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1519 (9th Cir.1992))

"The scope of an alternatives analysis depends on the underlying 'purpose and need'

specified by the agency for the proposed action." *League of Wilderness Defs.-Blue Mountains*

*Biodiversity Proj. v. U.S. Forest Serv.*, 689 F.3d 1060, 1069 (9th Cir. 2012). The court "reviews

an agency's range of alternatives under a 'rule of reason' standard that requires an agency to set forth only those alternatives necessary to permit a reasoned choice." *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1160 (9th Cir. 1998). The "touchstone" for the court's review of a challenge under NEPA is whether the agency's "selection and discussion of alternatives fosters informed decision-making and informed public participation." *Westlands Water Dist. v. United States Dep't of Interior*, 376 F.3d 853, 872 (9th Cir. 2004) (quoting *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982)).

The 2017 EA describes four alternatives that were considered but eliminated from further consideration. NAR 186–87. These alternatives included Plaintiff's proposed reasonable alternative of limiting Defendant Ascot's prospecting to MS-708, an area of approximately 200 acres where both Defendant Ascot and the Government each own 50% of the mineral estate. NAR 186. This alternative would eliminate ten of the proposed drill sites and require redirection of drilling at two of the remaining sites to prevent boreholes from entering the subsurface of the adjoining lands. NAR 186. According to the 2017 EA, this alternative would not meet the purpose or need of either Defendant Ascot or the Government because it would "preclude delineation of the geotechnical features and mineralogical resources across the entire area of interest." NAR 186–87. Absence of the additional data that would be gathered over the entire Project Area prevents Defendants from gaining adequate information to assess whether a valuable deposit exists and taking any future administrative action on mineral leasing applications for the Project Area. NAR 187.

Plaintiff argues that the Federal Defendants' failure to further consider this alternative renders the 2017 EA inadequate. Pl. Mot. 24. Plaintiff asserts that Defendants have not provided a reasoned explanation as to why information from the entire Project Area—as opposed to

information gathered from sequenced prospecting, like that previously undertaken by Defendant Ascot—is necessary. *Id.* at 25–27. Defendants respond that the 2017 EA did not err in failing to consider this proposed alternative because limiting prospecting to only MS-708 would alter the nature of the scope of the Project such that it would no longer meet the needs of either Defendant Ascot or the Federal Defendants. Def. Ascot Mot. 15; Fed. Defs. Mot 20.

The Court finds that the 2017 EA gives an adequate explanation for eliminating the alternative that would limit prospecting to MS-708. Though Plaintiff's proposed alternative may reduce any potential impact of Defendant Ascot's prospecting on recreation in parcels MS-1330 and MS-1329, *see* Pl. Mot. 24–27, it would not—as the 2017 EA explains—serve the purpose and need of the Proposed Action, *see* NAR 186–87. The purpose and need of the Proposed Action, "in addition to fostering mineral development, is the government's interest in the scientific knowledge that might be gained from the full extent of the proposed prospecting." Fed. Def. Mot. 20 (citing NAR 186, 165–66). As the 2017 EA notes, an "MS-708-Only" alternative would eliminate ten of Defendant Ascot's twenty-three proposed drill pads and information about the mineralization below MS-1329 and MS-1330. Without complete information from the entire Project Area and the potential mineral deposit, the Federal Defendants assert that they would not have an understanding of the "geotechnical features and mineralogical resources across the entire area of interest." NAR 187. As noted elsewhere in the 2017 EA, there are gaps in the data from prior prospecting on the parcels such that there is presently an insufficient understanding of the undeveloped Margaret Deposit that exists in the Permit Area. NAR 153. Absent this data, the Government asserts that it could not ascertain whether a valuable deposit exists or take further action on any future leasing applications because there will still be a need for additional prospecting. NAR 187. It was therefore reasonable for the 2017 EA to eliminate

this alternative authorizing far fewer drill pads as inconsistent with the Proposed Action's

purpose and need.

      B.      Count 2: Cumulative Impacts

      Plaintiff argues that the Federal Defendants violated NEPA when they failed to consider

all the cumulative effects of the proposed prospecting. Pl. Mot. 19. Cumulative impacts are:

> [T]he impact on the environment which results from the incremental impact of the
> action when added to other past, present, and reasonably foreseeable future actions
> regardless of what agency (Federal or non-Federal) or person undertakes such other
> actions.  Cumulative impacts can result from individually minor but collectively
> significant actions taking place over a period of time.

40 C.F.R. § 1508.7. The agency regulations define "reasonably foreseeable future actions" as:

> [T]hose federal and non-federal activities not yet undertaken, but sufficiently likely
> to occur, that a Responsible Official of ordinary prudence would take such activities
> into account in reaching a decision. These federal and non-federal activities that
> must be taken into account in the analysis of cumulative impact include, but are not
> limited to, activities for which there are existing decisions, funding, or proposals
> identified by the bureau. Reasonably foreseeable future actions do not include those
> actions that are highly speculative or indefinite.

43 C.F.R. § 46.30; *see also* 36 C.F.R. § 220.3 ("Reasonably foreseeable future actions" are

"[t]hose Federal or non-Federal activities not yet undertaken, for which there are existing

decisions, funding, or identified proposals."). Ninth Circuit precedent has held that "[f]or any

project that is not yet proposed, and is more remote in time, a cumulative effects analysis would

be both speculative and premature." *Lands Council v. Powell*, 395 F.3d 1019, 1023 (9th Cir.

2005).

      In a 2010 case, the Ninth Circuit considered a "cumulative effects" argument as part of

the plaintiff-environmental group's NEPA challenge to the BLM's approval of an amendment to

a plan of operations for an existing mineral exploration project in Nevada. *Te-Moak Tribe v. U.S.

Dep't of the Interior*, 608 F.3d 592 (9th Cir. 2010). There, the BLM prepared an EA, concluded

on the basis of the EA's findings that the amendment would not significantly affect the

environment, and issued a DR/FONSI. *Id*. at 599. In addressing the cumulative effects

argument, the Ninth Circuit said:

> "NEPA requires that where 'several actions have a cumulative . . . environmental effect, this consequence must be considered in an EIS.'" *Neighbors of Cuddy Mountain v. U.S. Forest Serv*., 137 F.3d 1372, 1378 (9th Cir. 1998) (quoting *City of Tenakee Springs v. Clough,* 915 F.2d 1308, 1312 (9th Cir. 1990)); *see* 40 C.F.R. § 1508.25(c)(3). We also require that an EA fully address cumulative environmental effects or "cumulative impacts." *See, e.g., Kern v. BLM*, 284 F.3d 1062, 1076 (9th Cir. 2002) ("Given that so many more EAs are prepared than EISs, adequate consideration of cumulative effects requires that EAs address them fully.").
>
> \*\*\*
>
> In a cumulative impact analysis, an agency must take a "hard look" at all actions. An EA's analysis of cumulative impacts "must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment." *Lands Council*, 395 F.3d at 1028. "General statements about 'possible effects' and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mountain*, 137 F.3d at 1380. "[S]ome quantified or detailed information is required. Without such information, neither the courts nor the public . . . can be assured that the [agency] provided the hard look that it is required to provide." *Id*. at 1379.

*Id.* at 603–04.

Here, Plaintiff argues that the Federal Defendants failed to address the cumulative

impacts of: (1) a future mine linked to prospecting, and (2) the potential renewal of the permit for

up to four years.[8] Pl. Mot. 19–20. Defendants respond by arguing that Plaintiff has waived its

permit-renewal argument and that permit renewal and a future mine are not "reasonably

foreseeable actions" requiring a cumulative impacts analysis. Fed. Def. Resp. 20; Def. Ascot

Resp. 2–4.

---

[8] The Court notes that Plaintiff's assertion that the Federal Defendants failed to consider the potential renewal of the permit for up to four years in their cumulative impacts analysis does not appear in the Complaint. *See* Compl. ¶¶ 76–80.

i.    Future Mine

Plaintiff argues that the Federal Defendants erred in failing to consider the cumulative impacts of a future mine in the 2017 EA. According to the 2017 EA, available information indicates that the Permit Area may include a large portion of what is referred to as the undeveloped "Margaret Deposit." NAR 153. This deposit may be a "porphyritic calc-silicate system of Miocene age containing copper, molybdenum, silver, gold, and associated mineralization." NAR 153. After Duval acquired the land in 1969, only limited exploration programs and mine/metallurgical studies of the Deposit—including diamond core drilling—were undertaken before the eruption of nearby Mount St. Helens in 1980. NAR 153. "Cessation of fieldwork . . . occurred before an understanding of the Margaret Deposit sufficient for current economic resource evaluation was developed." NAR 153. Specific gaps in the data include: (1) an inadequate understanding of the "geology of the porphyry system, controls on mineralization, and alteration patterns" to model the quantity, grade, and mineralogy of the deposit; (2) inadequate definition of the limits of the porphyry system and internal drilling density; and (3) loss of cores from pre-1980 exploration activities such that they are "not available for confirmatory analysis using modern quality assurance and controls." NAR 153.

While acknowledging that approval of the prospecting permits was consistent with federal policy including the Mining and Mineral Policy Act of 1970,[9] *see, e.g.*, NAR 17–18, the

_____

[9] Under the Mining and Minerals Policy Act, Congress declared:

[I]t is the continuing policy of the Federal Government in the national interest to foster and encourage private enterprise in (1) the development of economically sound and stable domestic mining, minerals, metal and mineral reclamation industries, (2) the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help assure satisfaction of industrial, security and environmental needs, (3) mining, mineral, and metallurgical research, including the use and recycling of scrap to promote the

2017 EA also concludes that a future mine is not a reasonably foreseeable future action, NAR 189–90. The 2017 EA bases this conclusion on (1) the current state of mineral knowledge of the Area and (2) lack of existing decisions, funding, or proposals for development of a mine in the Area. NAR 189. The 2017 EA notes that "[h]ardrock mineral prospecting of the type proposed does not mean a mine is reasonably foreseeable, as a mineral deposit of sufficient magnitude and economic value must first be discovered before consideration can be given to the feasibility of the manner and means of mine development." NAR 190. Though past studies suggest that an undeveloped deposit may exist under the Project Area, there are gaps in existing data. NAR 190. The 2017 EA also cautions that "[i]nterest in mineral exploration does not in and of itself indicate the presence of a valuable deposit," and according to Defendant USFS "authoritative estimates" indicate that only 1 in 5,000 to 10,000 prospects develop into producing mines. NAR 190 (citing USDA 1995). Moreover, the 2017 EA concludes that at this stage it is not possible to foretell what mining methods would be viable. NAR 190. Should a mineral deposit not exist in the Project Area or lack sufficient value, a mine would not be feasible. NAR 190.

At various places in the record, Defendants acknowledge that there was a "great deal of concern that [the] decision somehow makes the potential for future approval of a new mine in this area easier or more likely." NAR 74 (USFS DN and FONSI); *see also* NAR 72, 78, 85. But

---

wise and efficient use of our natural and reclaimable mineral resources, and (4) the study and development of methods for the disposal, control, and reclamation of mineral waste products, and the reclamation of mined land, so as to lessen any adverse impact of mineral extraction and processing upon the physical environment that may result from mining or mineral activities.

….

It shall be the responsibility of the Secretary of the Interior to carry out this policy when exercising his authority under such programs as may be authorized by law other than this section.

30 U.S.C. § 21a.

the 2017 EA and related documents clarify that the decisions at issue in this case "facilitate[] only prospecting (exploration) activities within the prospecting permit areas" and are "not a mineral leasing or development (mining) proposal." NAR 72, 77–78. Indeed, "[t]here is no proposal for a mineral lease or mine in this location." NAR 75. If a valuable mineral deposit were located, the permit holder could apply to the BLM for a lease to develop the minerals, which would require a separate NEPA analysis and decision which the USFS must consent to. NAR 72, 75, 85; *see also* NAR 168 (2017 EA).

Plaintiff argues that Defendants erred in failing to consider the cumulative impacts of a future mine linked to the proposed prospecting.[10] Pl. Mot. 20. In support of its argument that a mine was a "reasonably foreseeable future action," Plaintiff points to: (1) Defendant BLM's regulations that prospectors cannot remove material except to demonstrate a valuable mineral deposit, 43 C.F.R. § 3505.10(c); (2) the Federal Defendants' citations to the federal mining policy in the DR, DN, and 2017 EA; (3) the Federal Defendants' decision not to consider a "lower-impact alternative on the basis of needing to foster a potential mining project;" and (4) Defendant BLM's previous conclusion that the area was "suitable for mining as an open pit," *Vanderbilt Gold Corp.*, 126 I.B.L.A. 72, 74, 1993 WL 217390, *2 (Apr. 19, 1993). *Id.* Defendants argue that—under relevant caselaw and the Agencies' regulations—a mine was not reasonably foreseeable because there is no specific proposal for a mine, most prospects never develop into a mine, and too much is unknown about the Margaret Deposit. Fed Def. Mot. 21–23; Def. Ascot Mot. 16–19.

---

[10] The Court notes that Plaintiff does not appear to argue that a future mine is a "connected action." *See* Pl. Resp. Def. Ascot Mot. 10 (distinguishing a case because it focused on the plaintiffs' connected action arguments and did not consider any cumulative effects analyses). Accordingly, the Court limits its analysis to the foreseeability of the mine under the cumulative impacts analysis.

On this issue, the Ninth Circuit's analysis in *Jones v. National Marine Fisheries Service*, 741 F.3d 989 (9th Cir. 2013), is instructive. There, the plaintiff argued that the defendant-agency had failed to analyze the cumulative impacts of plans to "widen the scope of mining in the future." *Id.* at 1000. The circuit court began its discussion of this issue by noting that "[a]n agency need only consider the cumulative effects of projects that the applicant is already proposing . . . . For any project that is not yet proposed, and is more remote in time, by contrast, a cumulative effects analysis would be both speculative and premature." *Id.* (internal citations and quotations marks omitted). It went on to note that "the majority of the[] plans [to widen the scope of mining] are speculative and have not been reduced to specific proposals." *Id.* "[T]here [was] no reliable study or projection of future mining," and the applicant's "general statements regarding a desire for increased mining [gave] no information as to the scope or location of any future projects or even how many such projects [the applicant] contemplate[d] pursuing." *Id.* at 1001. Accordingly, the court concluded that the "general plans for expanded mining . . . [did] not require a cumulative impacts analysis." *Id.*

Here, too, the Court finds that the Federal Defendants were not required to consider a future mine in their cumulative impacts analysis. As in *Jones*, there are no existing decisions, funding, or proposals for the development of a mine in the area. NAR 189; *see also Chilkat Indian Vill. Of Klukwan v. Bureau of Land Mgmt.*, 399 F.Supp.3d 888, 922 (D. Alaska 2019) (finding no error in declining to consider a future mine in its cumulative effects analysis where there was no "specific, quantifiable information about the parameters of future mine development"). Indeed, the Federal Defendants—in response to comments expressing concern about a future mine—repeatedly state that there is no proposal for a mine and any such proposal would require its own separate NEPA analysis and consent decision from Defendant USFS.

NAR 72, 75, 85, 168. They also note that at this stage it is "impossible to foretell what mining methods, if any, are viable." NAR 190. The 2017 EA further explains that the lack of information regarding the Margaret Deposit both justifies the Proposed Action and explains the uncertainty surrounding the viability of a future mine. Though fieldwork was undertaken in the past by other private entities, it was ceased after the eruption of Mount St. Helens and before "an understanding of the Margaret Deposit sufficient for current economic resource evaluation was developed." NAR 153. The 2017 EA specifically notes gaps in the prior data collected, including loss of pre-1980 cores that otherwise may have been available for confirmatory analysis. NAR 153, 190. In addition, the 2017 EA notes that for the manner and means of mine development to even be considered, the Margaret Deposit must be of sufficient magnitude and economic value: "It is possible that such a deposit does not exist in the Project Area or, if present, lacks sufficient value, in which case mining would not be feasible." NAR 190. Moreover, USFS information cited by the 2017 EA demonstrates that very few prospects—from 1 in 5,000 to 1 in 10,000— ever develop into producing mines. NAR 190 (citing USDA 1995). Taken together, the Court cannot find that the Federal Defendants violated NEPA by not discussing a future mine in their cumulative impacts analysis.

Plaintiff's arguments in opposition do not change the analysis. First, Plaintiff takes issue with the Federal Defendants' statements throughout the DR, DN, and 2017 EA regarding their compliance with federal mining policy. But the Federal Defendants' statements of compliance with federal law tasking the Secretary of the Interior with fostering and encouraging private enterprise in developing domestic mining does not make the ultimate development of a mine any more foreseeable. Again, as Defendants have explained, too little is known about the suitability of the Margaret Deposit for mining, no proposal for a mine in the Project Area is currently

pending, and most prospecting does not result in a mine. In essence, Plaintiff is arguing that a

mine's potential environmental impacts "can and should be analyzed at the prospecting stage."

Pl. Resp. Def. Ascot's Mot. 9, ECF 67. But such a conclusion finds no basis in the precedent of

this circuit.

Second, Plaintiff emphasizes a 1993 administrative decision from the United States

Department of the Interior of an appeal of a decision of the BLM rejecting a hardrock

prospecting permit in the Project Area. *See Vanderbilt Gold Corp.*, 126 IBLA 72, 1993 WL

217390 (April 19, 1993).[11] There, the BLM had rejected the permit, declining to allow

prospecting in the area because it had deemed the Margaret Deposit workable—i.e. there was

sufficient data regarding the quality and quantity of the deposit that the BLM had determined the

cost of extracting the deposit was less than the value of the commodity. *Id.* at *1–2; *see also*

NAR 63701. The company appealed the decision, arguing that the data used by the BLM did not

support their findings and that further exploration was necessary. *Id.*, 1993 WL 217390 at *4.

According to Plaintiff, this decision demonstrates that the area has already been deemed

suitable for an open pit mine. Pl. Mot. 20; *see also Vanderbilt*, 1993 WL 217390, at *2 ("The

Margaret Deposit is a major porphyry copper deposit suitable for mining as an open pit." (BLM

Formal Mineral Report)). However, as Defendants point out, the *Vanderbilt* decision is now

nearly thirty years old, and there are gaps in the data that may be filled in by prospecting. Fed.

Def. Resp. 21 (citing NAR 153 (noting, among other things, that pre-1980 cores are no longer

---

[11] Defendants also argue that Plaintiff's arguments concerning *Vanberdbilt* are waived. However, there is no dispute that Plaintiff did comment on the Federal Defendants' failure to consider a potential mine, which the Court finds is adequate to satisfy the exhaustion requirement of NEPA. *See Lands Council v. McNair,* 629 F.3d 1070, 1076 (9th Cir. 2010) (To satisfy the exhaustion requirement, "a claimant need not raise an issue using precise legal formulations, as long as enough clarity is provided that the decision maker understands the issue raised.") (internal quotation and citation omitted).

available for confirmatory analysis using modern quality assurance and controls)). In this
context, stale information about the suitability of the deposit for open-pit mining does not make a
mine a reasonably foreseeable future action. *Cf. N. Plains Res. Council, Inc. v. Surface Transp.
Bd.*, 668 F.3d 1067, 1076–79 (9th Cir. 2011) (finding that the agencies erred in limiting their
cumulative effects analysis to five years when a recently prepared EIS regarding overlapping
projects that had projected the growth of mining activity over twenty years). Accordingly, the
Federal Defendants did not violate NEPA in declining to consider a potential future mine in their
cumulative effects analysis of the Proposed Action.

    ii.      Renewal of Permit

    Plaintiff argues that "[t]he most fundamental cumulative impact ignored by the [2017
EA] is the potential renewal of the permit for up to an additional four years." Pl. Mot. 19 (citing
NAR 76). Plaintiff notes that the 2017 EA established a ten-year term for the analysis of impacts
because the permit could last for six years. *Id.* (citing NAR 188). The Federal Defendants
respond that Plaintiff's arguments regarding inconsistencies between the timing analysis in the
2017 EA and the potential permit length are waived because they were never raised in comments
to the 2015 draft of the EA. Fed. Defs. Resp. 6. Defendants also argue that the permit renewal
does not qualify as a "cumulative impact" because it is not a "reasonably foreseeable future
action" under 40 C.F.R. § 1508.7. Def. Ascot Resp. 12; Fed. Defs. Resp. 20 (arguing permit
"renewals are available only in the limited circumstances spelled out in 43 C.F.R. § 3505.62,
making them too speculative to consider here").

    Assuming—without deciding—that Plaintiff's arguments are not waived, Plaintiff's
claim fails. Plaintiff does not point to any specific data providing the agencies with specific,
quantifiable information about a future permit extension, such as the anticipated length of any

future action or extension, the number of holes anticipated to be drilled, or the portion of the

Project Area affected. Indeed, Plaintiff appears to rely largely on the existence of the permit

renewal regulations. The permit application itself and the regulations—by default—provide that

prospecting permits will be effective for an initial two-year period, NAR 76; 43 C.F.R.

§ 3505.60, and the regulations permit the BLM to extend prospecting permits for up to an

additional four years if the applicant proves that they "explored with reasonable diligence and

were unable to determine the existence and workability of a valuable deposit covered by the

permit" or their "failure to perform diligent prospecting activities was due to conditions beyond

[their] control," 43 C.F.R. §§ 3505.61, 3505.62. The Proposed Action, however, is expected to

be completed in five months, with "[s]ome scheduling flexibility . . . to meet seasonal conditions

and timing limitations required by the Agencies to comply with the GPNF Forest Plan, as well as

the purposes for which the lands were acquired." NAR 173. Though Defendant Ascot requested

an extension on its 2010 prospecting activities, AR 21509, this alone does not make a four-year

permit extension a reasonably foreseeable future action, especially when the initial term of the

permit is two years and any renewal is contingent on findings that Defendant Ascot acted with

reasonable diligence or that its failure to do so was due to conditions beyond its control. At this

point, any analysis of a possible future permit renewal and its scope would be speculative.

Accordingly, the Federal Defendants did not err by failing to address the cumulative impact of a

four-year permit renewal.

C.    Count 3: "Hard Look" at Impacts on Recreation

Plaintiff argues that the Federal Defendants violated NEPA by failing to take a "hard

look" at the potential impact that prospecting would have on recreation. Pl. Mot. 15. Specifically,

Plaintiff contends that the 2017 EA's analysis is "unnecessarily limited in terms of the duration

of the impacts and is often confusing and contradictory in terms of the scope and scale of those impacts to recreation." *Id.* "NEPA imposes a procedural requirement on federal agencies to 'take a "hard look" at the potential environmental consequences of the proposed action.'" *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011) (quoting *Or. Nat. Res. Council v. Bureau of Land Mgmt.*, 470 F.3d 818, 820 (9th Cir. 2006)) (brackets omitted). "Taking a 'hard look' includes 'considering all foreseeable direct and indirect impacts'" and "'should involve a discussion of adverse impacts that does not improperly minimize negative side effects.'" *League of Wilderness Defs.-Blue Mountains Biodiversity Proj. v. U.S. Forest Serv.*, 689 F.3d 1060, 1075 (9th Cir. 2012) (citation omitted).

As noted above, the 2017 EA contains an eight-page assessment of the impacts the Proposed Action would have on recreation. The Gifford Pinchot National Forest and the Goat Mountain vicinity—the area encompassing the Project Area—provide a variety of recreational opportunities for the public. NAR 301. The primary use of the Project Area is the Green River Horse Camp, Green River Trail #213, and Goat Mountain Trail #217, with the recreation season running primarily from July through October due to weather-related accessibility limitations. NAR 302.

The Horse Camp and trails would remain open to the public during the Proposed Action, as would dispersed recreation opportunities in semi-primitive or undeveloped settings north of the Project Area in the Tumwater Roadless Area. NAR 303, 304, 308. However, the "naturalness of the areas in the immediate vicinity of the surface disturbance would be temporarily affected during operations," and noise disturbance from drilling—which would occur twenty-four hours a day, seven days a week, and carry up to ¼ mile—could reduce the opportunity for solitude in the

immediate vicinity of each drill pad. NAR 304–05. But only one drill pad would be operational at a time for one week at a time, and the disruption would be temporary. NAR 304–05.

Traffic from the 15-20 workers commuting to and from the Project Area would add additional vehicle traffic to the Goat Mountain site, though employee vehicles would not interfere with visitors to the Horse Camp because they would park elsewhere. NAR 305. Additional temporary noise from the movement of heavy equipment would also occur in May and November, at the beginning and end of the Proposed Action. NAR 305.

According to the 2017 EA, there would be no adverse impact on hunting and only a temporary reduction in wildlife viewing opportunities. Some tree removal, noise, and the presence of workers may affect individual wildlife in the Project Area, but the populations as a whole would not be impacted because these activities would occur at one drill site at a time. NAR 305. Wildlife would vacate the area adjacent to operating equipment due to noise and disperse to other areas around the Project Area where hunting and viewing activities could continue. NAR 305–06.

The chosen alternative—Alternative 4—would reduce impacts on recreation by eliminating drill Pads 6 and 7, the drill pads closest to the Horse Camp. NAR 308. In addition, a portable drill shack would muffle noise and reduce light impacts from drilling. NAR 304. Baffles and insulation would be used on the drill shacks to reduce noise, and lighting would be directed towards the drill to reduce light impacts. NAR 307. There would, however, be some additional vehicle traffic under this Alternative from a truck bringing in water from off-site. NAR 307.

Plaintiff makes two main arguments to support its claim that the 2017 EA failed to take the requisite "hard look" at the effect of the Proposed Action on recreation. First, Plaintiff argues that the analysis was "unnecessarily limited in scope" and asserts that there is a discrepancy

between the five-month scope of the impacts analysis and the two-year permit term. Pl. Mot. 15–16. Second, Plaintiff argues that the analysis is "confusing and contradictory" in terms of the scope and scale of the impacts on recreation, identifying points in the 2017 EA's recreation analysis that are either confusing or inconsistent with other sections of the 2017 EA. *Id.* at 16–18.

As to Plaintiff's first argument, the Court finds that the Federal Defendants did not err in limiting their analysis of the impacts on recreation to a five-month period. As Defendants point out, the five-month timeline is consistent with Defendant Ascot's permit application and the timetable of operations laid out earlier in the 2017 EA. Defendant Ascot's permit describes the timetable of operations as a five-month period, between mid-late May and late October with the exact span of time depending on when the permits are approved. NAR 1429. The 2017 EA's timetable of operations—while acknowledging that weather conditions may require some adjustments to the proposed timeline—describes a five-month period for Defendant Ascot to complete the proposed drilling with the planned equpiment between May and late October. NAR 173. The discussion of the Proposed Action's direct and indirect effects on recreation, consistent with this timetable, focuses on roughly the same amount of time. *See* NAR 304–05 ("Noise effects [from drilling] would . . . be temporary in that the noise effects would last only as long as the exploration was scheduled (3–4 months) . . . . There would also be a temporary noise increase from the mobilization of heavy equipment at the beginning (as early as May) and end (as late as November).").

As to Plaintiff's second argument, however, the Court agrees that the 2017 EA's analysis of the Project's impacts on recreation is often confusing and inconsistent, especially when read

in the context of the entire EA.[12] Perhaps most glaring is the vague analysis as to the extent of

the exclusion of recreators from the Project Area. For example, the 2017 EA states that the

public would only be "temporarily excluded" from the "immediate vicinity" of the drilling

equipment but fails to provide information as to what this means. NAR 304. And elsewhere the

2017 EA suggests that exclusion could be more extensive: "For safety reasons, public access to

drill sites in the northern portion of the Project Area would be limited during active drilling

through the use of a temporary locked gate." NAR 174. Thus, the analysis leaves one with

significant questions about the extent of the Project's effects on recreation. Would the public be

excluded only during the week-long operation of the drill pad, or would the period of exclusion

include the time before and after drill pad operation when workers are engaged in activities such

as tree removal and reclamation at each of the sites? What area surrounding the drill pad

constitutes the "immediate vicinity?" Would recreators be completely excluded from the

northern portion of the Project Area during drilling operations in that area, or just prevented from

accessing temporary roads?

In addition, the 2017 EA is internally inconsistent and incomplete in its discussion of

noise impacts. The section discussing recreation focuses on noise from drilling, which travels ¼

of a mile. NAR 315. It does not, however, discuss how noise from drilling might affect

individuals recreating on the Green River, which is within ¼ mile from two of the proposed drill

sites. NAR 308. The discussion of the effects on recreation is also largely silent as to the effect of

noise from excavators and chainsaws, except to state that there would "be a temporary noise

---

[12] In response, Defendant Ascot also asserts that the Court already concluded that the 2012 EA's assessment of recreation complied with NEPA. Def. Ascot Resp. 9. There, however, the Court was faced only with the question of whether the cumulative effects analysis associated with the 2012 EA's discussion of recreation was adequate. *Gifford Pinchot Task Force*, 2014 WL 3019165, at *35.

increase from the mobilization of heavy equipment at the beginning (as early as May) and end

(as late as November)[.]" NAR 305. And as the Biological Assessment notes, noise from these

tools and equipment will travel over ½ mile. *See* NAR 390, 394. Yet, there is no discussion of

how these noise impacts would affect recreation on the Green River or on the edge of the

Tumwater Roadless Area even though there are drill pads within ½ mile of both. NAR 308.

Thus, even if the effects of the Proposed Action are temporary and negligible because they last

only five months and recreation will continue, it is still unclear the extent to which the Proposed

Action will disrupt opportunities for recreation in the Project Area during the Proposed Action,

which include fishing, kayaking, hiking, and dispersed camping. NAR 302–03. Accordingly, the

Court concludes that the Federal Defendants failed to take the requisite "hard look" at the

Proposed Action's impacts on recreation as required by NEPA.

   D.  Count 4: Baseline Groundwater Analysis

   Plaintiff argues that the Federal Defendants have failed to include a comprehensive

baseline groundwater analysis of the entire project area in the 2017 EA, just as they had in the

2012 EA at issue in this Court's previous decision. Pl. Mot. 21–24. "NEPA requires that the

agency provide the data on which it bases its environmental analysis." *N. Plains Res. Council,*

*Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1083 (9th Cir. 2011). "Such analyses must occur

before the proposed action is approved" because "once a project begins, the 'pre-project

environment becomes a thing of the past, and evaluation of the project's effects becomes simply

impossible." *Id.* (quoting *LaFlamme v. F.E.R.C.*, 852 F.2d 389, 400 (9th Cir. 1988)) (brackets

and quotation marks omitted). Thus, "[e]stablishing appropriate baseline conditions is critical to

any NEPA analysis." *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101

(9th Cir. 2016). "Without establishing the baseline conditions which exist . . . before [a project]

begins, there is simply no way to determine what effect the [project] will have on the environment and, consequently, no way to comply with NEPA." *Id.* (quoting *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988)). "An agency need not conduct measurements of actual baseline conditions in every situation . . . [b]ut whatever method the agency uses, its assessment of baseline conditions 'must be based on accurate information and defensible reasoning.'" *Id.* (quoting *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 570 (9th Cir. 2016)).

In its previous decision, this Court held that the 2012 EA failed to comply with NEPA's "hard look" requirement because it did not include "baseline groundwater information upon which the conclusion of negligible impact can be made." *Gifford Pinchot Task Force*, 2014 WL 3019165, at *33. In finding the 2012 EA had not adequately addressed the effects of the Proposed Action on groundwater, the Court emphasized: (1) that the 2012 EA gave no explanation for why no baseline study had been performed or why no sampling of the water had occurred in the Project Area before analyzing the environmental effects and (2) that the monitoring to be undertaken during the Proposed Action had been proposed only with regard to two of the preexisting holes and with no monitoring of any other holes drilled as part of the Project. *Id.* at *31. The Court also noted that the 2012 EA failed to explain why sampling at two preexisting holes would provide accurate information about contamination to groundwater at the drill sites. *Id.* at *32. This Court also rejected Defendants' arguments that a baseline analysis was not required because of the sampling and monitoring that would be conducted during the Project. *Id.* at *31–32. The Court concluded that "without baseline data, the impact to groundwater remains uncertain because there is no information as to the current conditions of the actual Project Area." *Id.* at *33. Thus, the requirements of NEPA had not been satisfied. *Id.*

Like the 2012 EA, the 2017 EA addresses the potential effects of the proposed drilling on groundwater under the four alternatives considered by the Federal Defendants. Alternative 2 presents the most significant potential effects on groundwater in the Project Area. Under this alternative, Defendant Ascot would conduct approximately 110,000 feet of total exploratory drilling by drilling in sixty-three drillholes with an average length of 1,750 feet. NAR 202. Drilling fluids—water mixed with bentonite and polymer products that are potentially toxic—could mix with groundwater during the drilling process. NAR 202. In addition, the drilling process might create rock flour containing sulfide minerals and metals that could invade the adjacent bedrock and pose a risk to groundwater quality because of differences in the geochemical characteristics of the bedrock and rock flour. NAR 203. The drilling process could also result in new pathways and contamination between aquifers. NAR 204. Alternatives 3 and 4 provide additional limitations on the drilling process that would reduce the effects of prospecting on groundwater. These alternatives would require drilling fluid additives to meet certain government standards to eliminate the potential for toxic compounds to directly enter into the groundwater during drilling. NAR 208. Drilling methods employed would promote the creation of a "mudcake" along the drillhole wall, reducing both groundwater contamination by drill cuttings and cross-aquifer environmental impacts. NAR 208. These alternatives would also use periodic testing to ensure minimal effects on groundwater. NAR 184, 210.

In addition, the 2017 EA includes a substantial discussion of the topography, geology, and hydrogeology of the Project Area, largely taken from a fifty-five-page Groundwater Resources Report (the "Report") attached to the 2017 EA as Appendix G. NAR 413. According to the Report, the Project Area consists primarily of an unconfined aquifer within the Green River Valley bottom deposits and a confined to semi-confined aquifer within the fractured

bedrock. NAR 432. The flow of the unconfined groundwater follows the topography, and its

occurrence and depth is variable, with "thin to non-existent saturated intervals lying immediately

above the bedrock in steep portions of the site and thicker saturated intervals within 10 feet or

less of the ground surface, within the valley bottom." NAR 432. A confined to semi-confined

aquifer appears to be present beneath the Project Area based on the artesian conditions observed

at the three drilled holes sampled as part of the baseline analysis during the fall of 2014. NAR

433. Groundwater flow within the bedrock is assumed to be along fractures and faults within

brecciated bedrock formations. NAR 433.

In order to establish a baseline of the groundwater quality in the Project Area, three

drilled holes from prior drilling were sampled in 2014. These holes—near the Green River Horse

Camp, Pad 10, and Pad 21—are all located in the eastern and central portions of the Project

Area. NAR 199. The 2017 EA asserts—without much discussion—that:

> [T]he conditions within the existing drillholes are considered to be representative
> of the groundwater conditions because of the flowing condition, the geologic
> formations encountered, the proximity to proposed drillhole locations, and
> topographic setting. Because the three drillholes present on site are flowing,
> problems with downhole purging and sampling are eliminated. Newly drilled holes
> may not represent the groundwater conditions until well purged and groundwater
> temperatures, clarity, and pH are consistent with data from the existing drillholes."

NAR 199; *see also* NAR 184. In addition, artesian conditions were previously encountered at

two other drilled holes at Pad 11 and Pad 6, located in the north central and southern portions of

the Project Area, respectively. NAR 199. An intermittent seep was also observed at Pad 18. NAR

199.

A metals-related analysis was conducted on the three samples collected at the Horse

Camp, Pad 10, and Pad 21 drill holes in the fall of 2014. NAR 434. Generally, the baseline

concentrations of the analyzed metals were below the relevant and appropriate water quality

standards. NAR 436. But the arsenic concentration from the Horse Camp Drill Hole was five times higher than the federal water quality standards and five to ten times higher than the arsenic levels from samples taken from Pads 10 and 21. NAR 436. Zinc and iron levels also varied between the drillholes, though the Report does not discuss the results for these metals. NAR 437. According to the Report, the presence of arsenic is consistent with the type of mineralization that has been characterized beneath the Project Area. NAR 436–37. The Report also speculates that the increased arsenic levels might represent site-specific background concentrations related to the east-west fault zone that coincides with several of the drillholes, including the Horse Camp Drill Hole, and the more strongly fractured and mineralized portions of the bedrock. NAR 436. Even though a 2002 analysis of water near the Horse Camp Drill Hole did not find elevated arsenic concentrations, the Report did not rule out potential latent impacts of previous mining activity, including the three abandoned mine adits adjacent to the eastern boundary of the Project Area where the Horse Camp Drill Hole is located. NAR 436–37.

In addition to the metals-related analysis, the water samples were evaluated with Piper Diagrams in order to "evaluate the groundwater quality in terms of relationship between cations and anions, which can assist in assessing possible relationships between the water samples." NAR 443. The Piper Diagrams demonstrated that the groundwater samples from all three drilled holes were similar, further suggesting that the groundwater quality in terms of elevated arsenic is possibly reflective of the site-specific background conditions. NAR 446.

Now, Plaintiff again challenges the adequacy of the baseline groundwater analysis. Specifically, Plaintiff takes issue with the sampling conducted in 2014, arguing that it was inadequate in duration and location, as demonstrated by, among other things, the availability of other sample locations and the large disparities in results. Pl. Mot. 21–23. Defendants respond

that Plaintiff "merely quibbles" with the way in which the Federal Defendants chose to collect baseline data, a disagreement that requires the Court to defer to the discretion of the agencies. Fed. Def. Mot. 25. It further argues that Plaintiff's criticisms of the baseline groundwater study are contrary to the record, which includes a 55-page baseline Groundwater Resources Report. *Id.* at 25–26. Defendants also emphasize that the three holes sampled were selected because they are "all existing drillholes that are flowing in the Project Area" and considered "to be representative of the groundwater conditions in the Project Area based on the location of the samples obtained and results of the analytical testing performed on groundwater." *Id.* (citing NAR 184).

Though the analysis in the 2017 EA and associated Report is extensive and informative, the Court finds that it is still inadequate under NEPA. On this point, *Idaho Conservation League v. U.S. Forest Service*, 429 F. Supp. 3d 719 (D. Idaho 2019), is helpful. There, the defendant-agency approved the expansion of a gold exploration project on public lands following an environmental assessment and a finding of no significant impact. *Id.* at 723. The defendant examined the proposed project's potential impacts on groundwater and undertook a hydrogeological assessment. *Id.* at 726. The environmental assessment contained a map of water quality and flow monitoring on the east side of the project, but there was no past or ongoing monitoring on the west side of the project area where the drilling was to occur. *Id.* The environmental assessment also cited a groundwater review conducted by a firm retained by the private mining company, which concluded that the groundwater in the drilling area "likely flows southerly" and "the location and extent of these features is generally understood," but the "extent to which the structures are water-bearing is not understood." *Id.* at 731.

Emphasizing that "baseline data [was] crucial to the monitoring program" because "without a baseline the agency [would] not know when conditions are deteriorating," the court

found that the agency had failed to take the requisite "hard look" at the proposed project's impacts on ground water. *Id.* at 731–32. The district court noted that the defendant "could, consistent with its NEPA obligations, use its expertise to conclude that Dog Bone Ridge had similar hydrogeology to the east side." *Id.* But this analysis was absent from the environmental assessment: "The Forest Service never addressed whether the lack of monitoring [in the project area] was proper because its hydrogeologic conditions were similar enough to the east side drainage that monitoring on the east side would accurately estimate conditions on the west side." *Id.* at 732.

The 2017 EA in this case suffers from essentially the same flaw: the EA fails to explain why the three historical drillholes sampled once in 2014 are sufficient to establish an adequate baseline for the entire Project Area. Undoubtedly, there are key differences between the analysis in this case and the one at issue in *Idaho Conservation League*. Here, the three wells that were sampled and monitored are all located within with Project Area, and the Groundwater Resources Report concludes that the three samples collected are related based on Piper Diagrams. Defendants provide an explanation for their selection of these drill holes for sampling—namely, that they are the only existing drillholes still flowing. NAR 184. The 2017 EA and the Report both provide an extensive discussion of the topography and geology of the Project Area, ultimately putting forth a conceptual site model of the Project Area's hydrogeology. The 2017 EA also concludes that: "The conditions within the existing drillholes are considered to be representative of the groundwater conditions because of the flowing condition, the geologic formations encountered, the proximity to proposed drillhole locations, and topographic setting." NAR 199.

But the 2017 EA fails to provide further explanation or support for its assertion that the one-time sampling of three existing drillholes located in the east-central part of the Project Area is representative of the groundwater conditions for the entire Project Area. And the Report appears to be silent on this issue. Despite the Report's extensive discussion of the topography, geologic setting, and hydrogeology of the area, the Court is unable—on its own review—to ascertain how "the flowing condition, the geological formations encountered, the proximity to proposed drillhole locations, and the topographic setting" make these samples representative. NAR 199.

Other statements in the Report cast additional doubt on the Federal Defendants' conclusions. The 2017 EA and the Report recognize that the high arsenic levels in the samples might be related to the drillholes' proximity to an east-west fault line or the result of metals entering surface water percolating through fractured and mineralized bedrock in the upper portions of the Project Area. The Report further states that it cannot rule out the Horse Camp drillhole's proximity to a mine adit as the cause of its particularly high arsenic levels. In other words, there may be specific conditions at these drillholes effecting the quality of the water sampled such that they may not be reflective of groundwater conditions at other sections of the Project Area. Without more, the Court cannot conclude on this administrative record that the method utilized for establishing baseline conditions was "based on accurate information and defensible reasoning." *Great Basin Res. Watch*, 844 F.3d at 1101.

The Court acknowledges that much of the geology and bedrock of the area is unknown. Indeed, the Proposed Action may assist Defendants in confirming the conceptual site model described in the Groundwater Resources Report. *See* NAR 446–47, 462 ("[M]onitoring data would be utilized in conjunction with surface expression of groundwater and site specific

geologic conditions that could control ground water movement to confirm the groundwater conceptual model described in the report."). But difficulty conducting measurements of actual, precise baseline conditions does not excuse the Federal Defendants from demonstrating that their method of establishing a baseline was reasonable and based on accurate information. *See N. Plains,* 668 F.3d at 1086 ("The Board contends that it is entitled to rely on this outdated data because 'the physical environment of the area at issue here is substantially the same.' However, the Board does not cite any scientific studies or testimony in the record that supports this conclusion."); *see also W. Watersheds Proj. v. Ruhs*, 701 F. App'x 651, 655 (9th Cir. 2017) ("Pursuant to NEPA's 'hard look' requirement, an agency must prepare an up-front, coherent, and comprehensive environmental review, and 'vague and conclusory statements, without any supporting data' will not be sufficient." (internal citations and quotations omitted)). It may be that the Federal Defendant's chosen method of establishing a baseline is adequate, but there is currently insufficient support for this methodology in the record. Accordingly, the Federal Defendants have failed to take the "hard look" at the impacts of the Project on groundwater quality as required by NEPA.

> E.     Count 6: NEPA's Public Participation Requirement

Plaintiff argues that the Federal Defendants violated NEPA's public participation requirements in forcing Plaintiff to go through the public comment and objection process without highly relevant information it sought under the Freedom of Information Act ("FOIA"). Pl. Mot. 28. It is undisputed that the Federal Defendants made the 2015 EA available for public comment beginning on January 5, 2016, and extending through March 19, 2016. NAR 494. Plaintiff submitted a FOIA request to the Federal Defendants on January 21, 2016, before submitting its 2016 comments. NAR 39732–34. Plaintiff requested "all documents relating to the exploratory

drilling lease applications submitted by Ascot U.S.A., Inc. for the Margaret Deposit . . . and the associated Modified Environmental Assessment released in January 2016." NAR 39732.

Neither agency provided Plaintiff with a response before the comment periods concluded. Defendant BLM responded to Plaintiff's FOIA requests with responsive records in May 2016. NAR 24995–96. Defendant USFS first acknowledged Plaintiff's request in August of 2017, around the same time it issued the 2017 EA and its draft DN and FONSI for objections. NAR 10346–47. In an email to Plaintiff a month later, Defendant USFS informed Plaintiff that it had 9,000 records to review for sensitive information and that Plaintiff's request was number two in a queue of fifty-two open FOIA cases. NAR 9015. According to Plaintiff, as of the date it filed this lawsuit, the Federal Defendants had not completely responded to Plaintiff's 2016 FOIA request. Compl. ¶ 61.

"NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b). "NEPA's public comment procedures are at the heart of the NEPA review process." *State of Cal. v. Block*, 690 F.2d 753, 770 (9th Cir. 1982). Accordingly, "NEPA requires not merely public notice, but public participation in the evaluation of the environmental consequences of a major federal action." *Id.* at 771 (holding that refusal "to disclose [a proposed action] until after all opportunity for comment has passed . . . insulates [an agency's] decision-making process from public scrutiny" and "renders NEPA's procedures meaningless."). Pursuant to the regulations, agencies must "[m]ake environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of [FOIA][.]" 40 C.F.R. § 1506.6(f). And material that is incorporated by reference must be

"reasonably available for inspection by potentially interested persons within the time allowed for comment." *Id.* at § 1502.21.

"[T]he Ninth Circuit has 'not established a minimum level of public comment and participation required by the regulations governing the EA and FONSI process.'" *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Engineers,* 524 F.3d 938, 952 (9th Cir. 2008). However, it has held that "circulation of a draft EA is not required in every case" because "regulations governing public involvement in the preparation of EAs are general in approach [and] requiring the circulation of a draft EA in every case would apply a level of particularity to the EA process that is foreign to the regulations." *Id.* (citing 40 C.F.R. § 1506.6). Instead, under NEPA "[a]n agency, when preparing an EA, must provide the public with sufficient environmental information, considered in the totality of the circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Id.* at 953. "Determining whether the public was adequately involved is a fact-intensive inquiry made on a case-by-case basis." *Nat. Res. Def. Council, Inc. v. United States Forest Serv.,* 634 F.Supp.2d 1045, 1067 (D. Or. 2007).

In *ForestKeeper v. Elliott*, 50 F.Supp.3d 1371, 1386 (E.D. Cal. 2014), for example, the plaintiffs claimed that the defendants had violated NEPA's public participation requirement in failing to release to the public a draft EA and several scientific studies that were considered in the defendants' decision to issue a FONSI until after the close of the comment period. The district court acknowledged that cases decided after *Bering Strait* had concluded that "some level of dissemination of information and acceptance of comment short of the issuance of a draft EA was sufficient to satisfy NEPA's requirements to adequately inform the public and include the public to the extent practicable in the decision making process[.]" *Id.* With this in mind, the

court found that question before it was whether the defendants had violated their "NEPA-imposed duty to provide adequate pre-decision information to allow for informed public input" in failing to provide the scientific studies to the public prior to the close of the comment period. *Id.*

Focusing on "the nature of the information that is alleged to not have been provided and . . . the information that the parties challenging the agency's decision placed before the agency," the court concluded that the defendants were entitled to summary judgment. *Id.* at 1387–88. The court reasoned that "a court reviewing an agency decision under NEPA can only provide relief to a challenging party if it can be shown that information that was not before the agency would, if properly considered, present a 'seriously different picture of the environmental landscape.'" *Id.* at 1387 (quoting *Nat'l Comm. for the New River v. F.E.R.C.*, 373 F.3d 1323, 1330 (D.C. Cir. 2004)). The plaintiffs had not identified "any specific information that they would have included in their comments but did not because of the failure of the Forest Service to provide the scientific reports that were not available during the comment period." *Id.* Because of the "lack of any evidence that, had [the plaintiffs] been informed of the scientific reports underpinning the final EA prior to its finalization, they would have been able to put information before [the defendants] that would have been substantially different from what the [d]efendants did consider," the court found for the defendants. *Id.* at 1388.

By contrast, in *Center for Biological Diversity v. Gould*, 150 F.Supp.3d 1170, 1175, 1183 (E.D. Cal. 2015), the district court held that the defendants "did not provide adequate pre-decisional opportunity for public comment" on its analysis of a proposed project that would have authorized the treatment and logging of nearly 6,000 acres. There, the defendants had issued both a scoping notice and draft EA along with two corresponding comment periods. *Id.* at 1182.

However, they failed to publish their Wilderness Analysis, which explicitly addressed the potential for future wilderness designation of part of the project area, until the same day as the issuance of the final EA and DN/FONSI. *Id.* The information contained in the Wilderness Analysis—including any discussion of roadless areas, wilderness designation, and the inventory maps ultimately relied on by the defendants in assessing the area's wilderness potential—was nowhere to be found in the EA. *Id.* Thus, there was no opportunity for any public comment on the Wilderness Analysis. *Id.*

Even though the plaintiffs were ultimately "able to deduce from the scoping notice and draft EA that the [project] may impact wilderness areas," the court concluded that the agency violated NEPA's public participation requirement in failing to disclose this information earlier. *Id.* at 1182. In doing so, the court reasoned that other members of the public might have been able to weigh in on the issue if the information contained in the Wilderness Analysis had been disclosed sooner, or the plaintiffs might have been able to submit a more complete comment. *Id.* Indeed, the plaintiffs "specifically identified[ed] several important pieces of information they would have presented to [the defendants] if they had been given an opportunity to comment on the Wilderness Analysis. *Id.* at 1182–83.

According to Plaintiff, the question presented by this claim is whether "federal agencies, consistent with their obligations under NEPA, [can] fail to respond to an interested member of the public's timely requests for information under FOIA and force that interested party to go through the agencies' public comment and objection processes without highly relevant environmental information." Pl. Mot. 28. Plaintiff asserts that the answer to this question "must be 'no' if NEPA's public participation requirements are to be upheld and enforced." *Id.* In support of this argument, Plaintiff points to FOIA requests it submitted in 2016 and four

responsive records the Federal Defendants failed to provide that are alleged to have significantly

prejudiced Plaintiff's ability to weigh in and inform the decision-making process:

> (1) Detailed comments on the EA from USFS Regional Environmental Coordinator
> Julie Knutson, NAR 4853–76; Buchele Decl. Exs. 2A–2D, 4;
>
> (2) Comments from USFS biologists raising issues with wildlife and plant species
> Survey & Manage requirements, NAR 17618, 44719–20;
>
> (3) The USFS Response to Comment document for 2015 draft EA, NAR 13198,
> 18961–19012; and
>
> (4) An email comment from the Washington Department of Fish and Wildlife
> regarding the designation of riparian reserves in the Project Area; NAR 9557–
> 58.

*Id.* at 30–36.

As to Plaintiff's more general question—whether federal agencies violate NEPA when

they "fail to respond to an interested member of the public's timely requests for information

under FOIA and force that interested party to go through the agencies' public comment and

objection process without highly relevant environmental information"—the answer is no. *See* Pl.

Mot. 28. Failing to disclose documents responsive to a FOIA request does not, on its own,

amount to a *per se* NEPA violation under circuit precedent. The Ninth Circuit has cautioned that

there is no "established . . . minimum level of public comment and participation required by the

regulations governing the EA and FONSI process." *Bering Strait*, 524 F.3d at 952. Instead, the

agency must "provide the public with sufficient environmental information, considered in the

totality of the circumstances, to permit members of the public to weigh in with their views and

thus inform the agency decision-making process." *Id.* at 953. While the Federal Defendants'

response—or lack thereof—is certainly concerning, a finding that a FOIA violation constitutes a

*per se* NEPA violation without regard to the amount and type of environmental information that

was otherwise made available to the public would run contrary to Ninth Circuit precedent and

"apply a level of particularity to the EA process that is foreign to the regulations." *Id.* at 952. And while a federal agency's failure to respond to a FOIA request may, under certain circumstances, lead to a violation of NEPA, *see, e.g.*, *League of Wilderness Defs./Blue Mountains Biodviersity Proj. v. Connaughton*, No. 3:12–cv–02271–HZ, 2014 WL 6977611 at *14–15 (D. Or. Dec. 9, 2014) (finding the defendants violated NEPA when they failed to produce specialist reports relied on in the draft EIS and requested by the plaintiffs pursuant to a FOIA request), the Court cannot conclude that as a general matter the Federal Defendants' failure to respond to Plaintiff's exceedingly broad FOIA request constitutes such a violation.[13]

The Court is also unpersuaded by Plaintiff's argument that the Federal Defendants violated the public participation requirements of NEPA by failing to provide Plaintiff with the aforementioned documents. For example, Plaintiff argues that the Federal Defendants denied Plaintiff key information from detailed comments by the USFS Regional Environmental Coordinator, Julie Knutson. Pl. Mot. 31; Pl. Resp. Fed. Def. Mot. 27, ECF 66. Plaintiff emphasizes various points that Knutson made in her comments, including comments about the inadequacy of the draft EA's analysis of the Proposed Action's impacts on recreation. Pl. Mot. 32. Plaintiff generally asserts that these comments are relevant to the issues Plaintiff raised and "having these documents . . . would have allowed [Plaintiff] to submit a significantly more effective and detailed comment and objection." *Id.* But Plaintiff does not elaborate on what additional detail these comments would have provided to bolster its claims. *See ForestKeeper*, 50 F.Supp.3d at 1388 (finding the plaintiffs "placed before [the defendants] all the information

---

[13] As noted above, Plaintiff submitted a FOIA request for "all documents relating to the exploratory drilling lease applications submitted by Ascot U.S.A., Inc. for the Margaret Deposit . . . and the associated Modified Environmental Assessment released in January 2016" on January 21, 2016. NAR 39732; *see also* Compl. ¶ 3, ECF 1, *Cascade Forest Conserv. v. United States Forest Serv.*, D. Or. Case No. 3:19-cv-00481-MO (Plaintiff's related FOIA lawsuit).

they intended the Forest Service to consider" and noting that the plaintiffs "only generally contend they were unable to prepare comments that were adequately responsive"). Plaintiff has not demonstrated the resulting comments and objections that Plaintiff could have submitted to the Federal Defendants would have presented a "seriously different picture of the environmental landscape" to the Federal Defendants. *See id.* ("What tips this rather close case in favor of Defendants is the lack of any evidence that, had Plaintiffs been informed of the scientific reports underpinning the final EA prior to its finalization, they would have been able to put information before Defendants that would have been substantially different from what the Defendants did consider.").

The same is true for the other documents identified by Plaintiff. Plaintiff asserts broadly that having the 2015 Response to Comment document would be "helpful" and that it could have used these responses—which are alleged to have been materially different from the final EA and DN—when drafting its objection. In both its motion and response, Plaintiff emphasizes that it was "irregular" for the agencies to fail to include this document with the EA and FONSI.  Pl. Resp. 28; *see also* Pl. Mot. 33 ("[T]he USFS regularly prepares a Response to Comment document and attaches it to its final EA or draft DN."). But again—Plaintiff does not identify any specific information it would have included in its objections but for the Federal Defendants' failure to provide it with this document. Pl. Mot. 33–34. Nor does Plaintiff argue that the Federal Defendants violated NEPA in failing to disclose this document independent of Plaintiff's FOIA request.

Plaintiff also asserts that had it been provided with a copy of an email from the Washington Department of Fish & Wildlife to Defendant USFS questioning why certain streams had not been designated as riparian reserves it may have investigated and raised this issue in its

objections or "alleged a Forest Plan/NFMA violation similar to the claim it brought in 2013." *Id.* at 36. Similarly, Plaintiff identifies documents in which agency biologists raise potential deficiencies in a draft EA regarding the application of Survey & Management requirements and asserts—without any specificity—that only some of the issues raised by the biologists were corrected in the final 2017 EA. *Id.* at 32. Plaintiff goes on to state that despite acknowledging that the Project Area is subject to Survey & Manage requirements for several species, the USFS DN failed to impose any Survey & Manage Requirements regarding these species. *Id.* According to Plaintiff, this, too, likely violates the NFMA. *Id.* at 33. Plaintiff asserts it would have raised "Survey & Manage issues" had it been privy to the biologist's concerns. *Id.* at 32–33. But Plaintiff does not indicate exactly what "issues" it would have raised in its comments or objections or the claims that it would have brought short of a citation to the Forest Plan and NMFA. *Cf. Gould*, 150 F.Supp.3d at 1182–83 (noting the plaintiffs specifically identified the information they would have presented to the agency if they had been given an opportunity to comment on the Wilderness Analysis). Nor did Plaintiff clarify these issues when pressed at oral argument.

The Court emphasizes that its decision is not an endorsement of the Federal Defendants' delay in their responses to Plaintiff's FOIA request or their "irregular" decision to withhold the 2015 Response to Comment document. *See* Pl. Resp. Fed. Def. Mot. 28. Rather, in the context of this case, the Court finds that the Federal Defendants have not violated NEPA's public participation requirement in failing to respond to Plaintiff's broad FOIA request, which ultimately produced thousands of responsive documents. Unlike *ForestKeeper* and *Gould*— which involved the agencies' failure to disclose a draft EA, scientific reports, and other key analyses underpinning the EAs—the documents identified by Plaintiff here consist of internal

agency comments and an email exchange with a state agency. Moreover, Plaintiff's FOIA request did not specifically seek the aforementioned documents. Rather, it sought "all documents relating to the exploratory drilling lease applications submitted by Ascot USA., Inc. for the Margaret Deposit . . . and the associated Modified Environmental Assessment released in January 2016." NAR 39732. A finding that Defendants violated NEPA in failing to respond to Plaintiff's expansive FOIA request because it ultimately produced four sets of documents that might have been helpful to Plaintiff would effectively require the disclosure of the entire administrative record during the NEPA process. This is a conclusion which neither the regulations nor the law of this circuit support.

Here, the Federal Defendants issued a draft EA in advance of the comment period along with the scientific reports underlying their analyses. Plaintiff has not demonstrated that the Federal Defendants failed to provide sufficient environmental information, considered in the totality of the circumstances, to permit members of the public to weigh in with their views and inform the agency decision-making process in violation of the public participation requirements of NEPA. *See Bering Strait*, 524 F.3d at 953. Absent this showing, the Court must find for Defendants on this claim.

## CONCLUSION

The Court GRANTS in part and DENIES in part Plaintiff's Cross Motion for Summary Judgment [46], the Federal Defendant's Cross Motion for Summary Judgment [52], and Defendant Ascot's Cross Motion for Summary Judgment [45]. Defendants are granted summary judgment and Plaintiff is denied summary judgment on Plaintiff's First Claim for Relief and Counts 1, 2, and 6 of Plaintiff's Second Claim for Relief. Defendants are denied summary judgment and Plaintiff is granted summary judgment on Counts 3 and 4 of its Second Claim for

Relief. Within 30 days of this Opinion & Order, the parties shall confer and file a joint status

report that includes a proposed briefing schedule for Count 5 of Plaintiff's Second Claim for

Relief as well as remedies in light of the Court's decision on the parties' cross motions for

summary judgment.

      IT IS SO ORDERED.


      DATED:  February 15, 2021      .


MARCO A. HERNÁNDEZ
United States District Judge